## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____

STATE TROOPERS
NON-COMMISSIONED OFFICERS          :
ASSOCIATION OF
NEW JERSEY, et al.,                :

      Plaintiffs,                 :       Civil Action No. 3:08-cv-5326 (FLW)

        v.                       :

STATE OF NEW JERSEY, et al.        :

                         **OPINION**

      Defendants.                 :
_____

Before the Court is a Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6) filed by Defendants, the State of New Jersey, Office of the Attorney General, New Jersey Attorney General Anne Milgram, and the Division of State Police (collectively "Defendants"). This case arises out of the Department of Law and Public Safety's ("DLPS") proscription on the private practice of law by members of the New Jersey State Police (hereinafter "State Troopers" or "Troopers"). Plaintiffs, the State Troopers Non-Commissioned Officers Association of New Jersey and State Troopers Superior Officers Association of New Jersey, the Troopers' collective bargaining agents, bring this suit on behalf a group of about twenty-one officers,[1] all of whom are licensed attorneys in the state of New Jersey, to enjoin the State's enforcement of a new ethics code which prohibits State Troopers from engaging in the private practice of law. Plaintiffs challenge this provision of the Code, claiming violations of (1) the Fourteenth Amendment Equal Protection Clause; (2) the Fourteenth

_____

[1] For clarity, the Court will refer to the interested Troopers as "Plaintiffs," rather than the collective bargaining agents who are the named plaintiffs in this case.

Amendment Due Process Clause, specifically Plaintiffs' liberty and property interests; (3) Due Process and Equal Protection provisions of the New Jersey Constitution; and (4) Article I, Section 10 of the United States Constitution, which prohibits a state from impairing existing contractual obligations On April 22, 2009, the Court held oral argument on the pending motion. The Court has reviewed the parties' submissions, and for the reasons stated below, Defendants' Motion to Dismiss is granted.

## I. FACTUAL BACKGROUND

The facts of this case are not in dispute.  Plaintiffs are a group of about twenty-one State Troopers, licensed to practice law in the state of New Jersey, many of whom earned their law degrees while employed by the Division of State Police as State Troopers. Pursuant to a  provision in the parties' collective bargaining agreement, Troopers interested in attending an institute of higher education, including law school, could enter into a repayment plan with the Division of State Police whereby the Division would pay for a portion of the tuition.   After great sacrifice and effort to obtain their law licenses while employed full-time or part-time as Troopers, the Troopers engaged in limited legal work as a part-time profession. Specifically, Plaintiffs were employed as lawyers for clients in the drafting of wills and other testamentary documents and assisted in real estate closings. While Plaintiffs concede that this type of work obviously constitutes the practice of law, Plaintiffs assure this Court that no Troopers have participated in criminal or quasi-criminal proceedings, nor have any acted as a municipal judge, prosecutor, or public defender.

On May 20, 2007, the State Ethics Commission for the DLPS enacted a revised Code of Ethics, which, inter alia, prohibits Troopers from engaging in the outside practice of law in New Jersey or any other jurisdiction in which the Trooper may be admitted.  As currently

drafted, Troopers may engage in the private practice of law with the express prior approval of the Attorney General in circumstances limited to (1) pro bono representation of the Trooper's spouse, domestic partner, child, or parent in non-adversarial matters; or (2) representation that was initiated before May 20, 2007.  Importantly, the Attorney General may not grant approval if the proposed representation would require the Trooper to represent a party in a criminal or quasi criminal matter, before a State licensing or regulatory board, or where the State has an interest adverse to the Trooper's client, even in instances where the Trooper seeks to represent an immediate family member.  On June 21, 2007, Plaintiffs, obviously upset by this development, requested an Ethics Opinion from the Advisory Committee on Ethics concerning the ethical implications of the Troopers' outside legal work.  The Committee determined that Troopers could engage in the private practice of law pursuant to the Rules of Professional Conduct ("RPC"), but notwithstanding this finding, Defendants continue to enforce the revised Code of Ethics.[2]

The legislative and administrative backdrop highlights the rationale underscoring the revised Code of Ethics. Years prior to the May 20, 2007 enactment, the State of New Jersey commenced a vigorous ethical reform effort.  In November 2004, then acting Governor Richard Codey appointed Supreme Court Justice Daniel O'Hern, Sr. (ret.) and Seton Hall Law Professor Paula A. Franzese as Special Ethics Counsel.  As Special Ethics Counsel, the pair was charged with  recommending changes to the ethical rules for New Jersey's Executive Branch.  In light of its findings, see "Summary of Full Report, Report of the Special Ethics Counsel to the Governor of the State of New Jersey, Ethics Reform Recommendations for the Executive Branch of Government," the New Jersey Legislature enacted amendments to the New Jersey Conflict of Interest Law, effective March 15, 2006.

---

[2]The Advisory Committee on Ethics' Opinion, however, did not opine as to whether the DLPS, on its accord, could promulgate its own set of ethical rules.  See supra.

The State Legislature also called for an independent State Ethics Commission to oversee ethical reform in the state executive branch.  Prior to this enactment, an amendment to N.J.S.A. 42:13D-21(a), the Executive Commission on Ethical Standards was not an independent body.  Pursuant to the new legislation, the State Ethics Commission was required to enact a new ethics code within 180 days of the amendment.  The State Ethics Commission complied and promulgated a new ethics code, effective September 11, 2006, which provides:

> Pursuant to section 23(a)(1) of the Conflicts Law, each State agency is required to promulgate a code of ethics to govern and guide the conduct of State employees and special State officers and employees in the agency. Each code must conform to the general standards set forth in section 23 of the Conflicts Law, but may be formulated with respect to the particular needs and problems of the agency to which the code is to apply and, when applicable, shall be a supplement to the uniform ethics code to be promulgated pursuant to section 23(a)(2) of the Conflicts Law. An agency Code of Ethics is not effective until it has first been reviewed by the Attorney General's office and is found to be in compliance with the provisions of the Conflicts Law and any other applicable laws and is subsequently approved by the Commission.

As a result, each agency operating under the auspices of the Executive Branch instituted new ethical guidelines in keeping with the State Ethics Commission's findings.

The DLPS, which oversees the Division of State Police, was no exception.  After receiving the State Ethics Commission's approval, the revised Code of Ethics was implemented, effective May 20, 2007.  The revised Code of Ethics contains substantial changes.  Most importantly, while the former Code of Ethics' interdiction on "moonlighting" as a private lawyer applied only to Assistant and Deputy Attorneys General, the revised Code extended this provision to Troopers as well.  Troopers' conduct is also governed by their own Standard Operating Procedure ("SOP") Manual,which incorporates the revised Code of Ethics, and further prohibits Troopers from engaging in outside private security employment.

Citing the various mission statements of the DLPS and the Division of State Police and the Conflict of Interest Law, Defendants contend that the change was compelled by the new statewide code of ethics.  In further support, Defendants describe the nature and duties of State Police employment, which include a State Troopers' obligation to be "on duty" at all times.  Under N.J.S.A. 53:2-1, the State Police are subject to the call of the Governor, may exercise law enforcement power in a municipality, obtain and execute warrants, and are entrusted with general highway and traffic enforcement.

Generally, the Conflict of Interest Law prohibits a state employee from using his position to secure unwarranted privileges or advantages for himself or others, including direct or indirect financial benefits. The law also requires that state employees refrain from activity that colors their independent judgment, impairs their objectivity, and most importantly, creates the impression that the employee may be engaged in conduct that betrays the public trust.  In keeping with its mission "to protect the safety, the security and quality of life of the people of New Jersey through an integrated and coordinated structure of law enforcement and regulatory agencies," Defendants argue, the DLPS decided that actual conflicts of interest, or at the very least, an appearance of impropriety, could arise where Troopers engage in the private practice of law.

Defendants seek dismissal of Plaintiff's Complaint, claiming that (1) sovereign immunity shields Defendants from liability for damages and entitles Plaintiffs to only prospective injunctive relief against Attorney General Anne Milgram; (2) the revised Code of Ethics is amply supported by legitimate governmental objectives and survives rational basis review; (3) the proscription on secondary legal employment does not implicate either a property or liberty interest under the Due Process Clause; and (4) the revised Code of

5

Ethics does not impair any existing contracts and as such, does not run afoul of the Contract Clause of the United States Constitution, Article I, section 10.

### B. Procedural Background

Plaintiffs initiated this action in United States District Court for the District of New Jersey on October 27, 2008.  Thereafter, Defendants filed the present Motion to Dismiss Plaintiff's Complaint on March 11, 2009.  Plaintiffs have submitted opposition thereto. The Court heard oral argument on the Motion on April 22, 2009, wherein both parties made certain representations, including Plaintiffs' concession that they may only seek injunctive relief against Attorney General Anne Milgram and that Plaintiffs' state constitutional claims are subsumed by their federal constitutional claims under the Equal Protection and Due Process Clauses of the Fourteenth Amendment.  Plaintiffs also stipulated at oral argument that their Contract Clause claim under Article I, section 10 is not legally viable. For the reasons that follow, the Court will grant Defendants' Motion to Dismiss Plaintiff's claims.

## II. DISCUSSION

### A. Standard of Review

When reviewing a motion to dismiss on the pleadings, courts "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir.2008) (citation and quotations omitted). In Bell Atlantic Corporation v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), the Supreme Court clarified the 12(b)(6) standard. Specifically, the Court "retired" the language contained in Conley v. Gibson, 355 U.S. 41,

45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Id. at 1968 (quoting Conley, 355 U.S. at 45-46). Instead, the factual allegations set forth in a complaint "must be enough to raise a right to relief above the speculative level." Id. at 1965. As the Third Circuit has stated, "[t]he Supreme Court's Twombly formulation of the pleading standard can be summed up thus: 'stating ... a claim requires a complaint with enough factual matter (taken as true) to suggest' the required element. This 'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary element." Phillips, 515 F.3d at 234 (quoting Twombly, 127 S.Ct. at 1965).

**B. Sovereign Immunity**

Initially, the Court must determine whether Plaintiffs are precluded from seeking monetary damages in their Complaint. Defendants contend that Plaintiffs' claims against the State of New Jersey, Office of the Attorney General and the State of New Jersey, Division of State Police, must be dismissed in their entirety; instead, Plaintiffs may only proceed with their claims for prospective injunctive relief against Attorney General Anne Milgram.

The Eleventh Amendment to the United States Constitution provides:

> The Judicial power of the Untied States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. CONST. amend. XI. Over time, the Eleventh Amendment's broad immunity provisions have been extended to not only preclude suits brought by citizens of other states, but also

7

claims brought by a state's own citizens. <u>Koslow v. Pennsylvania</u>, 302 F.3d 161, 168 (3d Cir. 2002) (citing  <u>Hans v. Louisiana</u>, 134 U.S. 1, 13 (1890)).  However, Eleventh Amendment immunity is not absolute.  Recognizing that "[t]he State has no power to impart to him any immunity from responsibility to the supreme authority of the United States," <u>Ex parte Young</u>, 209 U.S. 123, 159-60 (1908), the Supreme Court has carved out limited exceptions to the general immunity provisions of the Eleventh Amendment:

> First, Congress may authorize such a suit under its power "to enforce the Fourteenth Amendment-an Amendment enacted after the Eleventh Amendment and specifically designed to alter the federal-state balance."[<u>Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.</u>, 527 U.S. 666, 670 (1999)] (citing <u>Fitzpatrick v. Bitzer</u>, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976)).  Under this exception, Congress abrogates a state's sovereign immunity "when it both unequivocally intends to do so and 'act[s] pursuant to a valid grant of constitutional authority.' " [<u>Board of Trustees of the University of Alabama v. Garrett</u>, 531 U.S. 356, 363 (2001)]  (quoting <u>Kimel v. Bd. of Regents</u>, 528 U.S. 62, 73, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000)). Second, a state may waive its sovereign immunity by consenting to suit. <u>Coll. Sav. Bank,</u> 527 U.S. at 670, 119 S.Ct. 2219 (citing <u>Clark v. Barnard</u>, 108 U.S. 436, 2 S.Ct. 878, 27 L.Ed. 780 (1883)); <u>Atascadero State Hosp. v. Scanlon</u>, 473 U.S. 234, 238, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985). Of course, in addition, a person seeking purely prospective relief against state officials for ongoing violations of federal law may sue under the "legal fiction" of <u>Ex parte Young</u>, 209 U.S. 123, 159-60, 28 S.Ct. 441, 52 L.Ed. 714 (1908), despite the text of the Eleventh Amendment. <u>See</u> [<u>Alden v. Maine</u>, 527 U.S. 706, 7113 (1999)].

<u>Koslow</u>, 302 F.3d at 168. At issue here is the third exception, whether Plaintiffs' request for prospective injunctive relief against Attorney General Anne Milgram may proceed.  In <u>Ex parte Young</u>, the Supreme Court held that in the case of a continuing constitutional violation, the Eleventh Amendment does not prevent a federal court from granting prospective injunctive relief.  Notwithstanding sovereign immunity, the Court reasoned that an injunction is appropriate when a state official acts unconstitutionally because he is "stripped of his official or representative character." <u>Young</u>, 209 U.S. at 160.  As developed,

however, the reasoning of Ex parte Young has not been extended to retroactive relief. See e.g., Eldeman v. Jordan, 415 U.S. 651, 665 (1974) (finding that a grant of retroactive relief "'fall[s] afoul of the Eleventh Amendment if that basic constitutional provision is to be conceived of as having any present force.'") (citation omitted); Pennhurst State School & Hospital v. Halderman, 465 U.S. 89, 105 (1984) (reaffirming Edleman); Green v. Mansour, 474 U.S. 64, 68 (1985).

Here, it does not appear that Plaintiffs challenge Defendants' general assertion that Plaintiffs are precluded from seeking damages from Defendants and that the State Defendants should be dismissed. Thus, the Court shall dismiss the State of New Jersey and the Division of State Police.  Instead, Plaintiffs rely on Ex parte Young and its progeny to buttress its petition for prospective injunctive relief against Attorney General Anne Milgram.  Indeed, at oral argument, Plaintiffs confirmed for the Court that they were proceeding exclusively for prospective injunctive relief against Attorney General Anne Milgram.

Notwithstanding, the Court notes that Plaintiffs' contention that Congress intended to abrogate 11th Amendment immunity when it vested federal courts with the exclusive authority over admission to its bar is misplaced. Plaintiffs are correct that Congress, through a legislative act, "may abrogate the States' Eleventh Amendment immunity when it both unequivocally intends to do so and 'act[s] pursuant to a valid grant of constitutional authority.'" Board of Trustees of the University of Alabama v. Garrett, 531 U.S. 356, 363 (2001) (quoting Kimel v. Board of Regents, 528 U.S. 62, 73 (2000)).  But Congress' power to abrogate a state's immunity may not be predicated on its general powers as enumerated in Article I.  Id.  Rather, "the Eleventh Amendment, and the principle of state sovereignty which it embodies, are necessarily limited by the enforcement provisions of § 5 of the Fourteenth Amendment." Fitzpatrick v. Bitzer, 427 U.S. 445, 456 (1976). Thus, Congress

may only abrogate a state's immunity in those instances when it has identified "a pattern of discrimination by the States which violates the Fourteenth Amendment." Garrett, 531 U.S. at 374.  To hold otherwise, the Supreme Court noted, would unconstitutionally enlarge Congressional power at the expense of the Eleventh Amendment.  Here, Plaintiffs cannot identify any provision in Congress' grant of plenary authority to federal courts in admitting lawyers that implicates Congress' § 5 power under the Fourteenth Amendment.  Hence, it is unequivocally clear that Congress did not and could not abrogate New Jersey's, or any other state's, sovereign immunity under the Eleventh Amendment with the passage of 28 U.S.C. 2071(a).  Accordingly, Plaintiff's claims may proceed against Attorney General Anne Milgram for prospective injunctive relief only.

### C. Plaintiffs' Equal Protection Claim

Defendants contend that Plaintiffs' Equal Protection Claim fails as a matter of law.  In short, Defendants argue that the regulation barring State Troopers from engaging in the private practice of law is presumptively valid and that Plaintiffs cannot demonstrate that the regulation is wholly irrational.  In response, Plaintiffs argue that the regulation does not pass constitutional muster even under rational basis review.

### a. Rational Basis Review

The Equal Protection Clause of the Fourteenth Amendment of the United States Constitution provides: "No State shall. . .deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1.  Before reaching the merits of an Equal Protection claim, a court must determine which standard of review should apply to its analysis of the challenged law.  Laws or regulations that involve a fundamental right or treat a suspect classification differently are subjected to the most exacting review, strict scrutiny.  If, on the other hand, the law at issue concerns only economic or social policy, and does not touch upon a suspect classification, then the law "must be upheld against equal

protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." FCC v. Beach Communications, Inc., 508 U.S. 307, 313 (1993) (citing Sullivan v. Stroop, 496 U.S. 478, 485 (1990)); see also Nordlinger v. Hahn, 505 U.S. 1, 11 (1992); Dandrige v. Williams, 397 U.S. 471, 484-85 (1970).

On rational basis review, "those attacking the rationality of the legislative classification have the burden 'to negative every conceivable basis which might support it.'" Beach Communications, 508 U.S. at 315 (quoting Lehnhausen v. Lake Shore Auto Parts Co., 410 U.S. 356, 364 (1973)); see, e.g., Heller v. Doe, 509 U.S. 312, 319-20 (1993) (finding that laws scrutinized under rational basis review are "accorded a strong presumption of validity."); Hodel v. Indiana, 452 U.S. 314, 331-32 (1981). Ordinarily, that burden is insurmountable. "[C]ourts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends. A classification does not fail rational basis review because it 'is not made with mathematical nicety or because in practice it results in some inequality.'" Heller, 509 U.S. at 321 (internal quotations and citations omitted). Thus, the fact that a statute is overinclusive or underinconclusive, standing alone, does not render the statute constitutionally invalid. The legislative process will, from time to time, yield imperfect results. Nevertheless, "[o]nly by faithful adherence to this guiding principle of judicial review of legislation is it possible to preserve to the legislative branch its rightful independence and its ability to function." Lehnhausen, 401 U.S. at 365 (quoting Carmichael v. Southern Coal & Coke Co., 301 U.S. 495, 510 (1937)).

A state need not provide justification or rationale for its legislative decision. Indeed, the Supreme Court has held that "legislative choice[s] [are] not subject to court factfinding and may be based on rational speculation unsupported by evidence or empirical data." Beach Communications, 508 U.S. at 315. That is not to say that a classification may be

11

arbitrary and capricious, only that a statutory classification "must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation. . .so that all persons similarly circumstanced shall be treated alike." Reed v. Reed, 404 U.S. 71, 76 (1971) (citation omitted).  Most importantly, the Supreme Court has emphasized that rational basis review "is not a license for courts to judge the wisdom, fairness, or logic of legislative choices," even if at best they can be described as ill-advised, improvident decisions.  Heller, 509 U.S. at 319 (quoting Beach Communications, 508 U.S. at 313)); New Orleans v. Dukes, 427 U.S. 297, 303 (1976) (finding that "the judiciary [may not] sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines."). Thus, once a court finds there is a credible reason for a legislative action, the law must be upheld. United States Railroad Retirement Board v. Fritz, 449 U.S. 166, 179 (1980).

In the present case, Plaintiffs concede rational basis review applies to the Code of Ethics's prohibition on outside legal work.   The challenged regulation does not draw lines according to suspect classes nor does it encroach upon a fundamental right.  Accordingly, the Court will apply the rational basis test to the equal protection challenge to the Code of Ethics, which requires Plaintiffs to demonstrate "the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that [a court] can only conclude that the legislature's actions were irrational." Hodel, 452 U.S. at 314 (quoting Vance v. Bradley, 440 U.S. 93, 97 (1979)).   Indeed, rules which limit a state or municipal employee's ability to engage in off-duty employment, are not uncommon, and when subsequently challenged on Equal Protection grounds, courts have consistently applied rational basis review to these types of ordinances or regulations.  See, e.g., Novak v. Pittsburgh, No. 05-00897, 2006 WL 3420959, at *2-3 (E.D. Pa. Nov. 27, 2006); Decker v.

City of Hampton, Virginia, 741 F. Supp. 1223 (E.D. Va. 1990); Bowman v. Pennsauken, 709 F. Supp. 1329 (D.N.J. 1989) ("The Resolution's classification of officers based on the type of off-duty work performed does not implicate any of the factors which require heightened scrutiny under equal protection.") (emphasis added).

**b. Defendants' Justifications for the Law**

Plaintiffs challenge the classes of State Troopers that the Code of Ethics ultimately creates: those State Troopers who practice law and those who perform non-legal services. Under the revised Code of Ethics, only legal work is prohibited outright while other types of employment that arguably could impair objectivity or give rise to a conflict of interest, may be submitted for DLPS approval.[3]   Defendants argue, however, that this classification is constitutionally valid given the State's interest in ensuring that State Troopers are fit for their primary obligations as law enforcement officers for the State, safeguarding the public trust and protecting against potential conflicts of interest.

The Court must then determine which rationales, if any, are legitimate, and whether the classification created by the Code of Ethics is rationally related to those legitimate government ends.  Here, Plaintiffs identify four conceivable rationales for the revised Code of Ethics: (1) State Troopers must be available for duty twenty-four hours a day as they are at the behest of the Governor at all times; (2) State Troopers have intimate knowledge and access to criminal records and criminal investigative materials; (3) State Troopers engaged in the outside practice of law may retain an unfair advantage over their adversaries; and (4) given the attorney-client relationship, Defendants would be unable to properly supervise off-duty legal work.  The Court notes that to some extent, all the justifications are cut from the same cloth, that is, Defendants are ultimately concerned about potential conflicts of interest and the appearance of impropriety.

---

[3] While the revised Code of Ethics only proscribes legal work, the SOP does indeed prohibit Troopers, as stated supra, from engaging in outside private security work.

As to the first justification, blanket prohibitions on <u>all</u> types of secondary employment for law enforcement officers have generally withstood constitutional challenges. <u>See</u>, <u>e.g.</u>, <u>Gosney v. Sonora Independent School District</u>, 430 F. Supp. 53 (N.D. Tex. 1977) <u>rev'd on other grounds</u>, 603 F.2d 522 (5th Cir. 1979) (upholding ordinance prohibiting teachers from working part-time); <u>Reichelderfer v. Ihrie</u>, 59 F.2d 873 (D.C. Cir. 1932); <u>Isola</u>, 34 N.J.Super at 547; <u>Borlin v. Civil Serv. Comm'n</u>, 338 N.W.2d 146 (Ia 1983) ("A city may prohibit its officers from undertaking secondary employment."); <u>Cox v. McNamara</u>, 8 Or.App. 242 (1972) ("Some of the legitimate objects to be accomplished by such a regulation are: to increase efficiency during off-duty hours; to help insure that the officers are available for police duty 24 hours a day; to avoid potential conflicts of interest; and to prevent any possible detrimental effect on the image of the police force because of the type of employment held by officers while off duty."); <u>Flood v. Kennedy</u>, 12 N.Y.2d 345 (1963).  Other municipalities have required public employees to receive prior approval before engaging in any type of secondary employment.  <u>See</u>, <u>e.g.</u>, <u>Bell v. District Court of Holyoke</u>, 314 Mass. 622 (1943); <u>Johnson v. Trader</u>, 52 So.2d 333 (Fla. 1951) (allowing officers to engage in part-time employment if it did not interfere with the performance of their primary duties); <u>Allison v. City of Southfield</u>, 172 Mich. App. 592 (1988).

However, the Court is unaware of any case where a municipality or township has singled out a specific type of employment solely on the grounds that its public officers are on duty twenty-four hours a day.   Blanket prohibitions on secondary employment where such proscriptions are not rationally related to this particular governmental interest have not even withstood rational basis review.  In <u>City of Crowley Firemen v. City of Crowley</u>, 280 So.2d 897 (La. 1973), the Louisiana Supreme Court struck down a city ordinance prohibiting firefighters from engaging in any outside employment.  Although the city had a legitimate interest in ensuring its firefighters were well-rested and available for duty at

14

any time, the prohibition was unduly burdensome, especially in light of the fact that firefighters had approximately five days of "off-duty" time during a seven day week.   In the present case, while the practice of law is demanding, the same can be said of the practice of medicine, real estate, private investigation, or professional boxing. What distinguishes the practice of law, at least in this regard, from other types of part-time employment is imperceptible. Thus, the classification created by the Code cannot be sustained on these grounds alone.

Defendants indicated during oral argument, however, that their concerns go beyond the physical demands of a Trooper's job, but extend to the possible issues that may arise from a Trooper's duty to enforce the law at all times.   To that end, Defendants clarified that one of their primary reasons for prohibiting Troopers from practicing as lawyers on a part-time basis was the Troopers' simultaneous obligation to uphold and enforce the laws of New Jersey, which would expose part-time lawyers to more ethical conundrums than other professions.   By way of example, if a Trooper is retained to draft a will for a client, and happens to come across nefarious, possibly illegal, activity during his review of his client's confidential personal records, the Trooper would find himself in an unenviable position, obligated by his duties as an officer of the law to report the crime while simultaneously constrained by his oath as an attorney to protect his client's confidences.   The Court recognizes that an off-duty Trooper must, even when he is not on the clock, uphold and enforce the laws of this State.   Therefore, the Court will look at this justification, and the other three set forth by Defendants, to determine whether there is a legitimate governmental purpose, and if so, whether the wholesale proscription on legal employment is rationally related to those goals.

Turning to the latter three justifications, Plaintiffs do not necessarily challenge the legitimacy of the governmental interest in preventing potential conflicts of interest or the

appearance of impropriety. The DLPS is by no means the first public entity to advance the State's interest in preserving the public trust as a rationale underlying restrictions on "moonlighting." See, e.g., Decker, 741 F. Supp. at 1223; Puckett v. Miller, 821 S.W.2d 791 (Ky. 1992) (upholding police regulation barring off-duty officers from engaging in the sale of alcoholic beverages); Fort Wayne Patrolmen's Benevolent Association v. City of Fort Wayne, 625 F. Supp. 722, 731 (N.D. Ind. 1986) ("The 'legitimate state purpose' behind Policy III is. . .preventing the damage to the reputation and effectiveness of the police force through police officers engaging in off-duty jobs inconsistent with official duties."); McAtee v. Mentzer, 174 W.Va. 49 (1984); Fraternal Order of Police, Local Lodge 73 v. City of Evansville, 559 N.E.2d 607 (Ind. 1990); Allison v. City of Southfield, 172 Mich.App. 592, 598 (1988) ("In support of [the regulation], defendants asserted that the operation of a private investigation business would present potential conflicts of interest between plaintiffs' employment as police officers and their secondary employment as private investigators.").

The Troopers in this case have chosen two very admirable professions.  On one hand, they are tasked with protecting the citizens of New Jersey and upholding its laws at great personal sacrifice to themselves, and many times, to their families.  On the other, they have sworn to uphold the Federal and State Constitutions and seek justice for their clients. While the duties and obligations of both types of employment undoubtedly cross over into the other, there are times where the private practice of law and the obligations of the Division of State Police could come into conflict and damage the public's perception of public servants and attorneys.[4]  Thus, the Court finds that the State's interest in guarding against

---

[4]As stated above, approximately twenty-one Troopers have been engaged in the private practice of law for a number of years before the revised Code was enacted.  Notably, the State does not cite any reported instances of misconduct or ethical transgressions as the impetus for the revised Code.  Thus, as an alternative to an outright prohibition, it could be argued that these Troopers should have been grandfathered in and permitted to continue with their secondary practice of law subject to departmental approval.  It is not, however, for the Court to weigh competing rational legislative decisions and decree which to be the most fair.  Under rational basis review, the Court is obligated to uphold the challenged law

potential conflicts of interest and preserving the public trust are legitimate governmental objectives.

Nevertheless, the fact that a governmental interest is a legitimate end does not necessarily justify the means, even where the statute is challenged under rational basis review.  See Bowman, 709 F. Supp. at 1342 ("Assuming, however, that the Township's Resolution clearly limited the shift of insurance and liability costs to third-party employers only when officers are injured or sued as a result of actions outside the scope, the court would still need to analyze the rationality of the classification created by the Resolution.") (emphasis in original).  Hence, this Court must still determine whether Defendants' decision to isolate the legal profession is rationally related to its ethical concerns. Essentially, Plaintiffs contend that although Defendants' goals are admirable, the manner in which they have chosen to effectuate the State's mandate on ethical reform is both overinclusive and underinconclusive. Overinconclusive in the sense that it prohibits part-time legal work that in no way implicates conflict issues, a position buttressed by the New Jersey Supreme Court's Advisory Opinion, and underinconclusive in that the new Code permits DLPS employees to engage in a variety of employment rife with conflict of interest issues. Again, Plaintiffs assure this Court that the officers in the present case do not wish to appear in criminal or quasi-criminal proceedings or on behalf of a regulated industry.

Conceding that certain attorney undertakings do raise potential ethical issues, Plaintiffs argue that given the Supreme Court's Advisory Opinion in June 2007, an across-the-board ban on the practice of law paints with too broad a brush and does nothing to advance the State's ethical reform effort.  However, that Opinion does not go as far as Plaintiffs would suggest.  The Opinion merely states that Troopers engaged in the part-

---

so long as it advances a legitimate governmental objective, regardless of the availability of more appropriate or effective remedies and the fact that the State's choice was "based on rational speculation unsupported by evidence or empirical data."  See Beach Communications, 508 U.S. at 315.

time practice of law would not, on its face, run afoul of the RPC.  The Opinion does not go on to declare the revised Code of Ethics superfluous, or alternatively, an executive act that breaches the separation of powers between the different branches of New Jersey government.

While it could be argued on the facts presented by Plaintiffs that a wholesale prohibition on the practice of law would appear so overinconclsuive as to border on irrationality, even so, that would not render the law unenforceable.  Plaintiffs must demonstrate, as is their burden under rational basis review, that no conceivable set of facts could support a rational basis for the revised Code of Ethics.  See Bowman, 709 F. Supp. at 1343 (finding that because other occupations such as a taxicab driver could expose police officers to problematic conduct not covered by the resolution, the "Township's asserted interest in reducing insurance costs and liability crumbles under the actual application of the Resolution.") (citing Grusendorf v. City of Oklahoma City, 816 F.22d 539, 543 (10th Cir. 1987).  Plaintiffs fail in this regard.

Several cases, while not directly on point, inform this Court's analysis.  In Allison v. City of Southfield, 172 Mich.App. 592 (1988), a group of police officers sought declaratory judgment that an internal police department rule that provided guidelines for the approval of secondary employment requests was impermissibly vague.  Specifically, the officers took issue with the city's decision to deny an officer's application to work as a private investigator when other officers were approved to work as an attorney practicing civil law, a consultant for a security alarm business, and an administrator for a firm engaged in security work.  In reversing the lower court's decision, the Allison court stated, "[w]e think it rational to conclude that private investigatory work overlaps with the normal duties of a police officer to an extent not implicated by the more specialized functions practiced by the other officers engaged in secondary employment.  Thus the denial of plaintiffs' request for

permission to become employed as private investigators, viewed in conjunction with permission granted for other types of secondary employment, does not lack a rational basis." Id. at 600.

In support of their position, Plaintiffs here heavily rely on the district court's holding in Bowman v. Pennsauken.   There, a group of police officers challenged a township resolution that prohibited police officers from working as off-duty private security guards. Concerned that potential liability issues might arise, the township sought to shift the complete burden of liability on the outside employer.  Notably, the indemnification mandate was not required in the undertaking of any other type of secondary employment.  Although recognizing "that a municipality's attempt to limit its exposure to liability and to protect the public treasury when an off-duty officer commits a tort outside the scope of police employment is a legitimate government end," the court found that the challenged resolution was too far reaching.   What especially troubled the Bowman court was that the indemnification provision improperly shifted liability from the township for potential acts for which it would ordinarily be responsible.

To the extent that the officer's off-duty activities benefit the public, the Bowman court found the township should bear some of the costs associated with an off-duty officer's potentially tortious conduct. The court further held that the resolution's classification, between officers engaged in security work and those who chose to engage in other types of employment, was wholly irrational. Citing an officer's sworn statutory duty to obey the law and enforce it, the court found that the classification was underinconclusive, as other off-duty activities, i.e. cab-driving, could also expose officers to situations where they would be obligated to take official action.[5]  "Because of these statutory duties, it is conceivable that

---

[5]

    The Bowman court found the Appellate Division's decision in Isola v. Belmar, 34 N.J.Super. 544 (App. Div. 1955), persuasive.  Isola, however, is distinguishable from the case at bar.  There, the court struck down a municipal ordinance that required pre-approval for all

an off-duty officer employed as a cabdriver would face more public exposure than an officer moonlighting as a security guard in a closed department store or school. . . .The Resolution does not support the distinction between officers based on the type of off-duty work." 709 F. Supp. at 1343.

Arguing that Bowman should strictly govern this Court's analysis of the challenged Code of Ethics, Plaintiffs fail to appreciate the nuances of the Bowman decision. First, the interests at play in Bowman are not akin to those advanced by Defendants in the present case. In Bowman, the municipality was concerned with shifting liability for tortious acts committed by its police officers engaged in private security work. In striking down the indemnification provision, the court held that the municipality's decision to seek complete indemnification for tortious off-duty conduct was impermissible, given the officers' obligations to uphold and enforce the law at all times. That the municipality would be responsible for tortious off-duty conduct that benefitted the public, albeit carried out while employed in a private capacity, rendered the municipality's objective invalid under the Equal Protection Clause: "The court finds that shifting the entire burden of litigation and liability onto third-party employers is not a legitimate government interest." Bowman, 709 F. Supp. at 1340 (citing Benelli v. City of New Orleans, 478 So.2d 1370, 1373 (La. Ct. App. 1985)). Here, as stated supra, the Court has already held that the interest which Defendants seek to advance is legitimate. Defendants need not tolerate their public employees' engagement in potentially conflicted private employment and may, within the

_____

types of secondary employment. In doing so, the court found the ordinance impermissibly vague as it did not provide guidelines for officials to determine which types of employment opportunities should be approved. Indeed, the Isola court upheld the prohibitory rule, sans the exception clause, finding that it was not arbitrary or capricious given the rationales asserted by the municipality. Here, the Code of Ethics does provide guidelines by which DLPS officials can determine whether the proposed type of representation, i.e. representing a family member in a non-criminal, non-adversarial manner, should be approved; however, those guidelines, Plaintiffs argue, are unduly restrictive and not rationally related to a legitimate governmental purpose.

confines of the Equal Protection Clause, proscribe certain off-duty conduct that may offend the public trust.  Thus, unlike Bowman, where the court found that the interest advanced by the municipality was illegitimate, Defendants are well within their powers to set forth regulations governing the off-duty employment of State Troopers.

Second, the Bowman court, assuming that the municipality had a legitimate interest in shifting liability to private security employers, found that the requirement's focus on private security ran counter to the rationale asserted by the municipality.  In so doing, the Bowman court posited that a variety of professions, including that of a cabdriver, could expose off-duty police officers to potential tortious liability that the municipality, under normal circumstances, would be obligated to cover, to the point that the "Resolution's asserted interest in reducing insurance costs and liability crumbles under the actual application." Id. at 1343.  Here, the challenged Code does not suffer from the same defect. Very few professions carry the same duties and obligations as the practice of law, namely the confidentiality privilege a lawyer is obligated to maintain with his clients.  And while other professions, e.g. priests or newspaper reporters, are subject to similar privileges, neither are as closely aligned with law enforcement as the practice of law. Additionally, unlike in Bowman, the Division of State Police, in its Standard Operating Procedures, prohibits Troopers from engaging in private security employment, demonstrating that the singling out of a profession is not without reason.

Other courts faced with similar prohibitions on specific types of employment have upheld the challenged regulation.  For instance, in Decker, 741 F. Supp. at 1228-29, police officers challenged a regulation that prohibited police officers from moonlighting as private investigators. The municipality proffered that off-duty private investigation work presented serious ethical concerns, as many assignments would be inextricably tied to criminal investigations. In upholding the regulation on both due process and equal protection

grounds, the court cited the municipality's previous determinations to prohibit officers from work as polygraph operators, evidencing the fact that the municipality could reasonably determine that private investigation posed a serious conflict of interest with an officer's primary employment. Id.

Here, the DLPS, in revising the Supplementary Code of Ethics, could have reasonably believed that the practice of law would place officers in a more precarious ethical situation than other types of employment, i.e. private investigation work or accounting. In addition, during oral argument, Defendants intimated that besides those Troopers that are lawyers, there are very few, if any, Troopers engaged in professions that operate with some sort of recognized privilege, e.g., physician-patient privilege. Based on this rough empirical data, the DLPS could conceivably have thought that the practice of law was the most prevalent of the secondary professions in the Division of State Police, and that the practice of law required special attention in the revised Code. That type of decision, even if not foolproof, has been upheld in the past. See Allison, 172 Mich.App. at 600. Although Plaintiffs do not presently participate in adversarial matters before a tribunal or regulatory body, that assurance does not prevent an officer, conceivably without this regulation in place, from starting his own criminal or quasi-criminal defense practice in the near future. Thus, while it may be the case that the outright proscription on legal work "approaches [the State's] policy objective with a meat axe instead of a scalpel," Puckett, 821 S.W.2d at 794, nonetheless, the DLPS' determination is related to the State's ethical reform effort.

Moreover, the DLPS, prior to the revised Code of Ethics, exempted State Troopers from the challenged proscription. In revising the Code, the DLPS could have been concerned with disparate treatment between DLPS employees in different divisions and thought it was appropriate to apply the proscription across-the-board. Indeed, it could be

argued that the revised Code does not create a classification at all but rather corrects inconsistencies in the Code's application. Ironically, if the DLPS had maintained the <u>status quo</u>, the Code of Ethics could have been the subject of a similar constitutional challenge brought by other DLPS employees, claiming that the disparate treatment offends the Equal Protection and Due Process Clauses.[6]

Notwithstanding these reasons and the difficult burden Plaintiffs must satisfy, the current classification created by the Code still remains troubling in the sense that the revised Code is simultaneously overinclusive and underinconclusive.  As mentioned above, the <u>Bowman</u> court struck down an ordinance that required only officers seeking to work as private security guards to satisfy the indemnification mandate.  In so doing, the court noted other situations that could give rise to shared liability that were not subject to the provision.   Conversely, by attempting to prevent potential conflicts, Defendants have exempted other types of occupations, i.e. private investigators, that arguably pose similar ethical questions and concerns.[7]   Stated another way, the justification offered by Defendants erodes to some degree due to the exclusion of these other types of employment from the list of proscribed occupations.  Unlike a State Trooper who wishes to work part-time as a private investigator, State Troopers-lawyers are foreclosed at the outset from even making their case that the work they wish to engage in, i.e. real estate closings or the drafting of testamentary documents, does not impair their objectivity nor raise potential

---

[6]Defendants' counsel, during oral argument, stated that he was unaware of whether Defendants, in applying an across-the-board ban on the practice of law, were concerned with the disparate treatment between DLPS employees in different departments. Nevertheless, "because we never require a legislature to articulate its reasons for enacting a statute, it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature." <u>Beach Communications</u>, 508 U.S. at 315.  Thus, it is entirely appropriate for this Court to speculate that disparate treatment <u>was</u> a rational basis for revising the Code of Ethics to include Troopers in the private practice of law prohibition with other DLPS employees.

[7]Defendants would contend that unlike private investigators and private security consultants, attorneys are bound by a confidential privilege to all clients.

conflicts of interest between the State Trooper's obligation to uphold the State's law and his obligations as an attorney to his client.

With that said, broad proscriptions on secondary employment based on ethical concerns have generally been upheld, see supra, as courts are discouraged from revisiting the legislative process. That the revised Code works in such a way as to draw a broad proscription where, under some factual circumstances, none is needed does not give rise to a cognizable Equal Protection claim under rational basis review. See Decker, 741 F. Supp. at 1228 (rejecting the plaintiff's argument that a regulation "both as drafted and as enforced, create[d] a random, inconsistent means of meeting the defendants' goals."). Ultimately, the DLPS could have determined that the practice of law presented difficult ethical questions better not decided on a case-by-case basis, and it is not for this Court to divine a more fair and effective Code of Ethics. For these reasons, the Court is satisfied that the revised Code of Ethics and its prohibition on the outside practice of law is rationally related to the State's interest in preserving the public trust and insuring that its employees do not place themselves in difficult ethical situations. Accordingly, Plaintiff's Equal Protection claim is dismissed.

### C. Due Process

Plaintiffs next argue that the challenged regulation offends the Fourteenth Amendment Due Process Clause. In sum, Plaintiffs contend that the prohibition amounts to a de facto taking of their professional bar licenses and implicates their property rights under the Fourteenth Amendment. In response, Defendants assert that Plaintiffs have nothing more than a unilateral expectation in secondary employment, insufficient to give rise to a property right; however, even if Plaintiffs had a property interest in their secondary employment as part-time lawyers, Plaintiffs had ample opportunity to contest the revised Code pursuant to N.J. Court R. 2:2-3(a)(2).

The Fourteenth Amendment Due Process Clause provides that "[n]o state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend XIV, § 1.  In construing due process claims, the Court must discern which type of due process claim, procedural or substantive, is at issue. In order to state a claim for due process, Plaintiffs must demonstrate that they were deprived of a protected property or liberty interest.  McCool v. City of Philadelphia, 494 F. Supp. 2d 307, 321 (E.D. Pa. 2007) (citing Mathews v. Eldridge, 424 U.S. 319, 332 (1976)).  The Court will discuss each in turn.

### a. Property Right Under the Fourteenth Amendment

In Board of Regents of State Colleges v. Roth, the Supreme Court clarified which claims give rise to a cognizable property right under the Fourteenth Amendment:

> To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it.  He must have more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it.  It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined.   It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate [sic] those claims.

408 U.S. 564, 570 (1972).  At issue in Roth was whether a state university professor retained a property right in his public employment after the university did not renew his contract.  In rejecting the professor's claim, the Court held that property rights are not created by the Constitution as "their dimensions [are] defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits," i.e., statutory benefits afforded to welfare recipients.  Id.; see also Goldberg v. Kelly, 397 U.S. 254 (1970).  The professor's employment contract, the Court noted, did not provide for renewal whatsoever.  Finally, the Court stated "[w]hen protected interests are

implicated, the right to some kind of hearing is paramount.  But the range of interest protected by procedural due process is not infinite." Roth, 408 U.S. at 569-70.

In applying Roth, the Third Circuit has held that a property interest may be "created expressly by state statute or regulation or aris[e] from government policy or a mutually explicit understanding between a government employer and employee" or alternatively, "can arise from written or unwritten state or local government policies." Carter v. City of Philadelphia, 989 F.2d 117, 120 (3d Cir. 1993); Stana v. School District of City of Pittsburgh, 775 F.2d 122, 126 (3d Cir. 1985).  A plaintiff may not, in lieu of a mutual understanding, rely on "longevity alone. . .[to] create a property interest." Hadley v. County of DuPage, 715 F.2d 1238, 1244 (7th Cir. 1983); Bollow v. Federal Reserve Bank of San Francisco, 650 F.2d 1093, 1099 (9th Cir. 1981).

Courts, faced with similar due process challenges, have generally held that an employee does not retain a property right in secondary employment.  See, e.g., Decker, 741 F. Supp. at 1226 ("Since the plaintiff has presented no more than an abstract need or desire to pursue work as a private investigator, no property interest has been implicated."); Fort Wayne, 625 F. Supp. at 731-32 ("To the extent that the property interest is alleged to be the outside jobs themselves, that interest is not encompassed by the fourteenth amendment so as to justify procedural due process protections."); Novak, 2006 WL 3420959, at *3; Neish v. City of Chicago, 338 F. Supp.2d 927, 931 (N.D. Ill. 2004).  Indeed, the Novak court noted that no property interest in secondary employment exists even where the city was well aware of various police officers owning off-duty businesses and engaging in secondary employment. Novak, 2006 WL 3420959, at *3; see Fort Wayne, 625 F. Supp. at 732 ("Finally, the fact that the City may have allowed outside employment for several years does not necessarily create any expectation in continued toleration on the City's part.").  However, those holdings do not end this Court's inquiry.  What makes the question in this

case more difficult is two-fold: (1) Plaintiffs participated in a repayment program with the Division of State Police that encouraged them to attend law school and they practiced law part-time under the original Code of Ethics; and (2) the prohibition at issue in this case implicates a professional license.

Notwithstanding those concerns for the moment, Defendants contend that no property interest exists in the case at bar.  First, Defendants rely on the notion that courts generally do not find a property right in secondary employment.  Second, Defendants assert that even if Defendants could contractually bind the DLPS to some arrangement whereby State Troopers could practice law, they could not do so at the expense of ethical rules.  In State, Office of Employee Relations v. Communications Worker of America, 267 N.J. Super. 582, 589 (App. Div. 1993), the Appellate Division stated:

> The determination of what constitutes ethical and proper behavior and thus what the substance of the agency's code of ethics shall be is delegated by statute to the head of each State instrumentality.FN3 N.J.S.A. 52:13D-23(a). Beyond this statutorily-imposed responsibility, however, is the more basic responsibility of any government to ensure ethical conduct in government. What is more fundamental to good government operations than a code of ethics? What is ethical or a conflict of interest cannot be determined at the bargaining table. An act either is or is not unethical or a conflict of interest.

However, this argument presupposes that the type of secondary employment Plaintiffs held implicates concerns covered by the revised Code of Ethics.  That assumption, however, is amply supported by the record in this case.  As admitted by Plaintiffs, certain representations would blur ethical lines, i.e. adversarial representation in criminal and quasi-criminal matters.  In addition, although the Third Circuit has held that a regulatory guideline or the parties' mutual explicit understanding may create a property interest, a mutual explicit understanding cannot be premised on representations made by officials without the authority to make them.  Piecknick v. Commonwealth of Pennsylvania, 36 F.3d 1250, 1257-58 (3d Cir. 1994).

Nevertheless, Plaintiffs maintain that a mutual expectation was created since the Division of State Police openly encouraged State Troopers to attend law school. That program, as stated _supra_, did not, as Plaintiffs contend, encourage Troopers to go to law school for the purpose of securing a secondary income. For instance, if the program's purpose was to better educate State Troopers in criminal procedure and adjudication and assist them in their primary duties as a State Trooper, or hypothetically, to help State Troopers transition out of the Division of State Police into another career, upon retirement, Plaintiffs could not honestly rely on that program to assert a property interest in off-duty private legal employment. It might be a different story if Defendants openly encouraged State Troopers to participate in the program so that State Troopers could take advantage of more off-duty employment opportunities. In that case, it would at least be arguable that a property interest was created. That hypothetical aside, the fact that Plaintiffs were permitted to engage in private legal practice before May 20, 2007, does not, in and of itself, create a property right under the Fourteenth Amendment. As stated _supra_, courts have generally held that acquiescing to certain types of secondary employment in the past does not engender a legitimate entitlement.

Even if this Court assumes _arguendo_ that a property interest was created, Defendants assert that Plaintiffs had ample opportunity to challenge the revised Code of Ethics. Specifically, Defendants cite New Jersey Court Rule 2:2-3(a)(2) which provides that the Appellate Division retains exclusive jurisdiction to "review final decisions or actions of any state administrative agency or officer, and to review the validity of any rule promulgated by such agency or officer. . .except that review pursuant to this subparagraph shall not be maintainable so long as there is available a right of review before any administrative agency or officer, unless the interest of justice requires otherwise." In turn, the Appellate Division has retained jurisdiction over actions for declaratory judgment

against the state Attorney General and the Division of Law and Public Safety.  See Fraternal Order of Police, New Jersey Lodge #91 v. State of New Jersey, Office of the Attorney General, 2007 WL 935620 (N.J.Super. App. Div. March 30, 2007); Prado v. State, 186 N.J.413, 421 (2006) ("There is no question that the Department of Law and Public Safety is a state administrative agency and the Attorney General a state officer for purposes of Rule 2:2-3(a)(2).").

This argument suggests that Plaintiffs could have challenged the Code revision via this route, or alternatively, taken the route of the plaintiff in In re Burke, 2005 WL 3822486 (N.J.Super. App. Div. March 3, 2006).  In Burke, the plaintiff, an investigator with the Office of the Public Defender ("OPD"), a division within the DLPS, sought to pursue outside legal work for a private law firm after passing the New Jersey bar.[8]  In rejecting his notification form for secondary employment, the OPD cited the DLPS's Code of Ethics, which prohibited such off-duty activities.  Having filed a grievance with the OPD and subsequently being rejected after requesting to work as a municipal prosecutor, the plaintiff took his case to the Appellate Division, which, in turn, asked the State Ethics Commission to clarify its position on the DLPS's Code of Ethics pursuant to New Jersey Court Rule 2:5-1(b).  The State Ethics Commission decided it did not have jurisdiction over the plaintiff's grievance as the gravamen of his complaint concerned constitutional questions similar to the ones asserted in the case at bar.

The Court need not determine whether Plaintiffs should have or could have taken alternate routes to challenge the legality of the revised Code of Ethics as it is abundantly clear that Plaintiffs did not retain a property right in secondary employment in the practice of law.  Nothing before this Court indicates that Plaintiffs could have such an

---

[8] Of import is the fact that although the Burke plaintiff was not acting as an attorney in his public capacity, the OPD interpreted the Code of Ethics' bar on legal work to apply with equal force to the plaintiff's off-duty private law practice.

expectation given that neither the DLPS nor the Division of State Police represented to Troopers that they may, under the reimbursement program, seek out secondary employment as private attorneys.   Accordingly, Plaintiffs' claims that they were deprived of a property interest when the revised Code of Ethics was enacted is without merit.

### b. Liberty Interest Under the Fourteenth Amendment

When construing due process claims, a majority of courts have focused on whether prohibitions on secondary employment implicate a liberty interest under the Fourteenth Amendment. See, e.g., Decker, 741 F. Supp. at 1223 (rejecting plaintiff's due process claims); Novak, 2006 WL 3420959, at *4; Neish, 338 F. Supp. 2d at 931; cf. McCool, 494 F. Supp. 2d at 325 (finding that no liberty interest was implicated when the plaintiff was rejected for employment with the city's fire department in light of the city's residency requirement for public employment).   While a person has the right under the Fourteenth Amendment Due Process Clause "to engage in any of the common occupations of life," Meyer v. Nebraska, 262 U.S. 390, 393 (1923), that liberty interest does not entitle a person to a specific job. Wroblewski v. City of Washburn, 965 F.2d 452, 455 (7th Cir. 1992). In Piecknick, the Third Circuit noted:

> "[T]he Constitution only protects this liberty from state actions that threaten to deprive persons of the right to pursue their chosen occupation. State actions that exclude a person from one particular job are not actionable in suits ... brought directly under the due process clause." Bernard v. United Township High Sch. Dist. No. 30, 5 F.3d 1090, 1092 (7th Cir.1993). " 'It is the liberty to pursue a calling or occupation, and not the right to a specific job, that is secured by the Fourteenth Amendment.' " Id. (quoting Wroblewski v. City of Washburn, 965 F.2d 452, 455 (7th Cir.1992)).

36 F.3d at 1259-60.  "[A]n employment action implicates a Fourteenth Amendment liberty interest only if it (1) is based on a 'charge against [the individual] that might seriously damage his standing and associations in the community'. . .or (2) imposes on him a stigma or other disability that forecloses his freedom to take advantage of other employment

opportunities." McCool, 494 F. Supp. 2d at 325 (quoting Robb v. City of Philadelphia, 733 F.2d 286, 292 (3d Cir. 1984)).

Here, Plaintiffs improperly frame their challenge. Defendants rightfully point out that the Code of Ethics does not deprive Plaintiffs of their law licenses but intrudes upon Plaintiffs' ability to engage in the secondary employment of their choosing. That right, however, has soundly been rejected as a recognized liberty right. As stated by the court in Novak: "[Plaintiff] is not deprived of his ability to make a living, and indeed, continues to be employed as a City police officer. . . .[and] remains free to compete for work. . .not covered by Chief's Order No. 05-004." 2006 WL 3420959, at *4. The Decker court, too, was highly skeptical of a general liberty right to secondary employment: "The defendants have not denied the plaintiff the opportunity to pursue his career as a police defective, they have only placed limits on his ability to seek certain types of off duty employment in addition to his full time occupation." 741 F. Supp. at 1226; see also Neish, 338 F. Supp. 2d at 931 ("If [plaintiff] is claiming that the relevant liberty interest is a right to engage in secondary employment, his claim fails as the liberty interest possessed by employees has never been expanded to require employers to make allowance for secondary employment.") (citing Silk v. City of Chicago, No. 95-143, 1997 WL 790598, at *14 (N.D. Ill. Dec. 17, 1997)). Further, it does not appear that Plaintiffs argue that they can satisfy the prongs set forth in Robb. Thus, the Court finds that on the facts as they are alleged, Plaintiffs do not have a liberty interest in their secondary employment as private attorneys.

Even if Plaintiffs retain a liberty interest in their off-duty work as lawyers, that finding does not insulate Plaintiffs' off-duty activity from regulation. Conn v. Gabbert, 526 U.S. 286, 291-92 (1992). In Kelley v. Johnson, 425 U.S. 238 (1976), the Supreme Court upheld a police regulation that prohibited officers from wearing their hair too long. Citing the Court's recent decisions that upheld regulations on speech by federal and state

employees, the Court found the regulation, which did not impinge upon a fundamental right, was rationally related to the county's goal and survived rational-basis review: "[t]he promotion of safety of persons and property." Id. at 247. Given the county's interest in preserving these interests, the Court found that the county reserved the right to govern a uniformed civilian service, which included the ability to regulate organization dress and equipment for its law enforcement personnel. Id.

The right to practice one's profession is at least as important as one's hair length,[9] and as such, regulations that touch upon the right to practice a profession receive rational basis review. Sammon v. New Jersey Board of Medical Examiners, 66 F.3d 639, 645 (3d Cir. 1995). Where rational basis review applies, a statute should be upheld when challenged on substantive due process grounds if the state identifies a legitimate state interest that the legislature rationally could conclude was served by the statute. Williamson v. Lee Optical of Oklahoma, Inc., 348 U.S. 483, 487-88 (1955) ("It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it").

Important to this case, the Decker court found that if all types of secondary employment may be barred, it follows a fortiori that a ban on a specific type of employment satisfies the Due Process Clause. While that argument is compelling, other courts, specifically the Bowman court, reject that logic, requiring some rational relationship between the municipality's decision to exclude one employment over another. As noted by one court in Louisiana: "The right to hold specific private employment and to follow a chosen profession free from unreasonable government interference comes within the 'liberty' and 'property' concepts of the Fourteenth Amendment." Benelli, 478 So.2d at 1372

---

[9]Justice Marshall, the author of the dissent in Kelley, would be inclined to disagree, arguing that "[the] right to choose his own personal appearance" is beyond reproach, "inextricably bound up with the historical right of 'every individual to the possession and control of his own person.'" 425 U.S. at 253 (Marshall, J., dissenting).

(citing <u>Greene v. McElroy</u>, 360 U.S. 474, 492 (1959) and <u>Banjavich v. Louisiana Licensing Board</u>, 111 So.2d 505 (La. 1959)). Again, the Court's review of Plaintiffs' due process challenge must determine if there is a legitimate end asserted by the government and whether the means challenged are rationally related.  If the Court were to strike down the proscription, it must do so upon a finding that the Code of Ethics "is so irrational that it may be branded 'arbitrary.'" <u>Kelley</u>, 425 U.S. at 248.

Even if the Court assumes that Troopers retain a liberty interest in the secondary employment of their choice, on this set of facts, Plaintiffs would be hard-pressed to demonstrate that the challenged proscription is too attenuated from the interests advanced by the State. On this motion, the revised Code is entitled to a "presumption of legislative validity" in the face of this due process challenge and nothing offered by Plaintiffs has disturbed this presumption.  <u>See</u> <u>Kelley</u>, 425 U.S. at 247; <u>Decker</u>, 741 F. Supp. at 1227. Because the policy  considerations advanced in defense of the revised Code under this Court's Equal Protection analysis apply with equal force here, the Court finds that the challenged Code, while imperfect, addresses a legitimate governmental concern. To accomplish its goal of preserving confidence in its police force, the State enacted a blanket Code prohibiting Troopers from engaging in the practice of law.  While other types of employment <u>may</u> implicate similar ethical issues, it cannot be said that the challenged regulation bears no rational connection to the State's goals.  Accordingly, Plaintiffs' Due Process claim is dismissed.

### D. New Jersey Supreme Court's Authority to Regulate the Practice of Law

Finally, the Court will address Plaintiffs' argument that the revised Code of Ethics infringes upon the New Jersey Supreme Court's plenary authority to regulate the practice of law.  Plaintiffs contend that under the New Jersey Constitution, the New Jersey Supreme Court is vested with "jurisdiction over the admission to the practice of law and the

discipline of persons admitted."  N.J. Const. Art. VI, § 2, ¶ 3.  While Defendants recognize that the New Jersey Supreme Court, in accordance with its constitutional mandate, governs general matters concerning the admission of attorneys to the New Jersey bar, such authority does not preclude state agencies from promulgating their own rules concerning their employees who also happen to be licensed attorneys.  In support, Defendants cite to the New Jersey Supreme Court's Advisory Opinion in In re Advisory Committee on Professional Ethics Opinion 705, 192 N.J. 46 (2007), in which the court held that the State may hold its legal employees to more rigorous ethical rules than those imposed by the Court's Code of Professional Conduct.  Although the State's conflict rules explicitly encroached upon the judiciary's exclusive authority over rules governing attorneys in the state, the court nevertheless upheld the rule, finding that from time to time, the respective branches of government may, based on a legitimate governmental purpose, encroach on each other's authority:

> Notwithstanding that grant of authority, "[i]n the spirit of comity," this Court has shared its jurisdiction with the Legislature and "upheld narrowly-circumscribed legislation that touches on attorney discipline." McKeown-Brand v. Trump Castle Hotel & Casino, 132 N.J. 546, 554, 556, 626 A.2d 425 (1993). In certain circumstances, although they "might impinge upon the Court's constitutional concerns," we have accommodated the lawful and reasonable exercise of power by the other branches of government on the practice of law. Knight, supra, 86 N.J. at 391, 431 A.2d 833; see also Passaic County Prob. Officers' Ass'n v. County of Passaic, 73 N.J. 247, 255, 374 A.2d 449 (1977) ("It has ..., since 1948, been the practice of this Court, with only occasional deviation, to accept and adopt legislative arrangements that have not in any way interfered with this Court's constitutional obligation.").

Id. at 55.  The fact that the rules did concern the practice of law, standing alone, did not offend the separation of powers doctrine.  "Rather, the Legislature merely sought to establish, within its prerogative, ethical guidelines for all State employees-attorneys and non-attorneys alike - and instill confidence in the public concerning the virtue of our State's civil servants."  Id. at 56.  Because the legislative purpose was legitimate, the Court recognized that this interference in its exclusive affairs was proper.  Id.

Much like the rules at issue in <u>Opinion 705</u>, the DLPS promulgated new ethical rules to supplement, not supplant, the court's Code of Professional Conduct.  What the revised Code seeks, as the State did in <u>Opinion 705</u>, is to instill greater confidence in the public sector by requiring public employees to be held to a higher ethical standard than those placed on private attorneys. The revised Code, for the most part, is in keeping with the Code established by the New Jersey Supreme Court, and does no violence to the basic ethical standards set forth therein.  Indeed, the disputed regulation does not take away the Troopers' licenses to practice law nor does it affect their admission to the New Jersey bar, actions still exclusively reserved to the authority of the New Jersey Supreme Court.

Moreover, if the Troopers were to prevail on this argument, state agencies would be precluded from holding their public employees, specifically attorneys, to a higher ethical standard than those imposed on private attorneys, regardless of the contents of the regulation. The New Jersey Supreme Court has clearly rejected such a rigid, formalistic approach to separation of power disputes, instead, requiring that the government advance some legitimate purpose for its actions.  Because Defendants have again advanced an interest in preserving the public trust, the Court finds that the revised Code is not an improper infringement upon the New Jersey Supreme Court's plenary authority in governing the practice of law in the State.

## III. CONCLUSION

For the foregoing reasons, the Court grants Defendants' Motion to Dismiss.

Dated July 8, 2009                                                     /s/Freda L. Wolfson
                                                                      Freda L. Wolfson, U.S.D.J.